**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**MILTON D. "PETE" DUNN, MASON DUNN,
KATE DUNN, BEVERLY SHORT, LISA FLAUTT,
MEREDITH FAVA; AND MILEAH WILLIAMS**             **PLAINTIFF**

**VS.**           **CIVIL ACTION NO.: 4:21-cv-136-JMV**

**AGRISOMPO NORTH AMERICA, INC.**           **DEFENDANT**

<u>**ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT**</u>

      This matter is before the Court on Defendant's motion for summary judgment [76] as to all claims of the Plaintiffs. Based on the law and rationale set forth below, the motion is **GRANTED IN PART AND DENIED IN PART**.

<u>**Facts Asserted**</u>

      According to the Plaintiffs' Statement of Material Facts (Ex. 1 to [82]) offered in response to Defendant's statement of undisputed facts,[1] by the year 2011, Plaintiff, Milton "Pete" Dunn, ("Dunn") had 30 years of experience in the crop insurance industry and was the founder, manager, and largest shareholder of Dunn, Marley & Harris Agency, Inc. ("DMH" or "the Corporation") (at 50% ownership). DMH and another principally Dunn-owned crop insurance agency, Bracey Insurance Agency, Inc. ("Bracey"), operated large volume crop insurance sales in the Mississippi and Arkansas Delta until May 26, 2011.

<u>**The Share Sale Agreement**</u>

      According to Dunn, after being courted to sell by principals of CGB Diversified Services, Inc. ("CGBDS"), including James McClelland, vice-president of CGBDS, and principals of

---

[1] There is no counterpart to Miss. R. Cir. & Cnty. Ct. 4.02 in federal court; thus, proposed statements of undisputed facts offered in support of motions for summary judgment are not required.

CGBDS's parent, CGB Enterprise Inc., Dunn and the other DMH/Bracey shareholders entered a share sale agreement on May 26, 2011, pursuant to which all of the stock of DMH and Bracey was sold to CGBDS.[2] The Share Sale Agreement ([76] at Ex. 1) was negotiated between Pete Dunn for DMH and James McClelland (among others) for CGBDS. The parties utilized, as a starting point, a standard "form" document that CGBDS had used in its previous purchases of other agencies. McClelland Dep., Ex. 4 to [82] at p. 21, ll. 4-16. The form included a version of paragraph 40 which was a "covenant not to compete" clause, which would prospectively apply to the DMH key employees who were to become CGBDS employees under the Share Sale Agreement. *Id.* at p. 21, ll. 17-25.

According to Plaintiffs' statement of material facts, McClelland testified at his deposition that during the negotiation phase, because of the importance to Dunn of working with the same group of people with whom a relationship of trust had developed, Dunn insisted that a modification be made to the form language of paragraph 40 which would void the non-compete clause in the event CGBDS's ownership or control changed after the share sale agreement was consummated. *Id.* at p. 22, ll. 1-7, 13-25; p. 23, ll. 1-25; p. 24, ll. 1-25; p. 25.; p. 32, ll. 2-17; p. 48, ll. 3-15; p. 54, ll. 11-16. McClelland was emphatic that this was the intent of paragraph 40, and went so far as to testify, "It's pretty simple in my mind. If CGB Enterprises ever sells Diversified Services, this noncompete doesn't apply, and it's as simple as that." *Id.* at p. 29, ll. 14-17.

The Share Sale Agreement was ultimately executed by Dunn and the other shareholders on behalf of DMH, as well as McClelland on behalf of CGBDS, and provided as relevant to the non-compete provision, its assignability, and the instant summary judgment motion:

---

[2] The stockholders of DMH were Pete Dunn, Christian Marley, Jack Harris and Jimmy Barrett. Stockholders of Bracey at the time of sale to CGBDS were Pete Dunn and Christian Marley. The contractual documents transferring the share ownership of both agencies to CGBDS are identical, and for purposes of brevity, references herein to DMH shall hereinafter also include Bracey.

THIS SHARE SALE AGREEMENT is made at Memphis, TN on May 26th, 2011 by CGB Diversified Services, Inc., a Louisiana corporation doing business as Diversified Crop Insurance Services ("Purchaser" or "CGBDS") and Milton D. ("Pete") Dunn, Jr., Christian T. Marley, Jack M. Harris, and James N. Barrett, each of whom is a shareholder in Dunn, Marley & Harris Agency, Inc., a Mississippi corporation (hereinafter collectively referred to as "Sellers").

Whereas Sellers collectively own one hundred percent (100%) of the issued and outstanding capital stock of Dunn, Marley and Harris Agency, Inc (Corporation)…

40.  **Covenant Not to Compete.** As a condition of Purchaser's obligations under this agreement, and to the extent that the Purchaser has not committed a material and continuing breach of this agreement, each Seller and each key employee shall execute a written agreement to accompany this share sale agreement, in which Seller or key employee shall agree that, while each Seller or key employee is employed by Purchaser and for a period of two years commencing on the last date of employment with Purchaser, **and assuming the Purchaser** complies with all provisions of this Agreement and **does not sell its crop insurance division to any other party, said Seller or key employee will not, directly or indirectly, within the existing marketing area of the Corporation, enter into or engage generally in direct competition with the Corporation in the business of insurance.[3]**

45.  Assignment. Neither this Contract nor any right created by this Contract shall be assignable by either Seller (or its successors in interest) or Purchaser without the prior written consent of the other, except for an assignment incident to a merger, consolidation, or reorganization of either party. Nothing in this Contract, expressed or implied, is intended to confer on any person, other than the parties and their successors, any rights or remedies under or by reason of this Contract.

Ex. 5 to [82] (emphasis added).

The Court notes the reference in paragraph 40 of the Share Sale Agreement to a written agreement "to accompany the share sale agreement" is to the Employment and Non-Compete Agreement executed simultaneously by Dunn with execution of the Share Sale Agreement. *See*

---

[3] Defendant offers this same contractual provision in support of its motion for summary judgment but inaccurately recites the last sentence as follows: "said Seller or key employee will not, directly or indirectly, within the existing marketing area of the Corporation, enter into or engage generally in direct competition with the Corporation **and** the business of insurance… ." Def.'s Mem. [77] at 5 (emphasis added).

[82] at Ex. 6. However, with respect to the instant motion for summary judgment, the Defendant does not raise the terms of the Employment and Non-Compete Agreement, nor do Plaintiffs rely upon the terms in opposition to the same. Nevertheless, the Court cites it in part here as relevant to the Court's discussion below of claimed damages for tortious interference with business expectation and in the interest of completeness. Pursuant to the Employment and Non-Compete Agreement:

1. **Employment and Duties.** Employee [Dunn] will serve in a managerial and sales agent role for Employer. Employee will serve at the direction of the Employer. The parties acknowledge that the primary duty of Employee will be to manage the operation and its employees in the same fashion as when he was an owner of DMH and Bracey, in order to keep the Book of Business intact and revenue above the thresholds outlined in the respective Share Sale Agreements with DMH and Bracey. In addition, he will advise the Employer as to the distribution of commissions to the former owners of DMH and Bracey…

2. **Compensation.** While Employee is employed with Employer, he will be compensated with a base annual pay rate of seventy-five thousand ($75,000) dollars. Employee may also be eligible to collect commissions relating to the policies and customers that he shares with any of the former owners at the rate of fifty percent (50%) of the amount that Employer collects as A&O subsidy or CAT Loss Adjustment Expense (LAE) as those terms are defined in the Share Sale Agreements. Employee and Employer will agree in writing separate from this Agreement on which of such policies and customers Employee will collect said commissions. On or about December of each calendar year, Employer will make the necessary calculations to settle the commission amount based upon projections of the A&O subsidy or CAT LAE. The parties acknowledge that Employer may need to later adjust said commission amount once it knows of its actual A&O subsidy and CAT LAE. Said commissions shall be subject to the deductions referenced in Paragraph 4 of the respective Share Sale Agreements.

6. **Termination of Employment.** There shall be no fixed date for termination of this employment agreement and it shall continue indefinitely until either Party desires to end the employment relationship. This is an "at will" employment contract wherein no cause is required for termination…

7. **Effect of Termination on Compensation.** On termination of Employee's employment with Employer in accordance with Paragraph 6, neither employer nor its affiliates shall be under any further obligation to Employee under this Employment Agreement, except to pay Employee the salary at the rate provided in Paragraph 2 through the end of the month in which the termination takes place and to provide Employee ,with any benefits that may have accrued through the end of that month.

4

8. **Noncompetition During Employment and After.** … Employee further agrees that, for a period of two years commencing on the last date of employment with Employer, he will not, directly or indirectly, own, manage, operate, join, control, or pai1icipatc in the ownership, management, operation, or control of, or be connected with, in any manner, any business within the States of Mississippi and Arkansas in any county wherein DMH or Bracey does or did business, that shall be in competition with the business of Employer, DMH, or Bracey presently being conducted. Employee further agrees and covenants not to contact, call on, or solicit any of Employer's customers for whom Employee provided services, on whom Employee called, with whom Employee became personally acquainted, or with whom Employee worked during employment with Employer, nor shall Employee make known to any competitive person or business entity, either directly or indirectly, the names or addresses of any such customers or any info1111ation relating in any maimer to Employer's trade practices and secrets or business relationship with such customers, for a period of two years beyond the date of Employee's employment termination. Notwithstanding any other terms herein, the non-solicitation and non-disclosure covenant contained in this paragraph shall apply throughout the continental United States, and shall not be limited to any geographic territory or radius defined elsewhere in this agreement. …

13. **Entire Agreement.** This Employment Agreement constitutes the entire understanding between Employee and Employer relating to employment with Employer. This Employment Agreement shall be binding on and shall inure to the benefit of the parties to it and their respective heirs, executors, administrators, legal representatives, successors, and assigns, and shall inure to the benefit of the affiliates of Employer and their respective successors and assigns.

Ex. [6] to 82. Further, the closing paragraph of the document stated as follows:

AGREED AND ACCEPTED BY THE UNDERSIGNED, WHO HAVE READ THE FOREGOING DOCUMENT, HAVE HAD THE OPPORTUNITY TO REVIEW IT WITH THEIR CHOSEN COUNSEL, FULLY UNDERSTAND IT, AND WHO INDIVIDUALLY WARRANT THEIR AUTHORITY TO EXECUTE IT AS OF THE DATE ABOVE.

*Id.*[4]

---

[4] Though not relevant to the summary judgment motion itself, the Court notes that the parties dispute the significance in the case of the non-compete and related provisions of the Employment and Non-Compete Agreement. On the one hand, Defendant asserts that like the non-compete provision in paragraph 40 of the Share Sale Agreement, it has enforceable rights against Dunn under the noncompetition provision set forth in paragraph 8 of the Employment and Non-Compete Agreement. On the other, Dunn cites deposition testimony of CGBDS's VP, McClelland, who explained in effect, that the Employment and Non-Competition Agreement, in so far as it addressed duties of Dunn not to compete for two years following his termination of employment by CGBDS, to merely have been intended as "boiler plate", and in any event, to be subject to the nullification provision set forth in paragraph 40 of the Share Sale Agreement, and thus voided by the change of control of CGBDS in 2020 when Endurance US Holding Corp. acquired its stock from CGB Enterprise Inc.

### The Continued Operations

According to the affidavit of Dunn, for approximately nine (9) years following the 2011 share sale to CGBDS, he, consistent with the terms of his Employment and Non-Compete Agreement referenced above, directed the split of commissions among the former DMH agents and maintained for himself at least a twenty (20) percent override commission on all policies sold by the other former agents of DMH. *See* [82] at Ex. 7, pp. 2-3. Furthermore, CGBDS, as their employer, paid all office overhead, bookkeeping, and other expenses associated with the sale of crop insurance by the agents.

Though it is not clear, it appears that at some point after the execution of the foregoing agreements, but well prior to 2020, DMH ceased existence. Later still, in September 2020, all of the stock of CGBDS was sold by CGB Enterprise Inc. to Endurance U.S. Holding Corp. ("Endurance"). Though again, the record is less than clear—it also appears that following the sale of the stock of CGBDS to Endurance, Dunn and others who had been employed by CGBDS pursuant to the 2011 Share Sale Agreement and the simultaneously executed employment and non-compete agreement(s), may have become employed, instead, by AgriSompo North America, Inc. ("AgriSompo"), though, apparently, no employment contracts were ever executed.

Further, it is unclear, based on the briefing of the parties just exactly how and when AgriSompo came into existence and if, when, and how CGBDS ceased to exist.[5] Nevertheless, at some point after September 2020, AgriSompo is contended to have formally offered Dunn employment with it, but as an "independent" or "quasi-independent" agent. This meant, in essence, Dunn would be responsible for the costs involved in selling crop insurance—rather than the

---

[5] AgriSompo has previously asserted that CGBDS still exists with all of its assets intact (*See,* [11] AgriSompo Resp. to Mot. for Prel. Inj.), but that has not, to date, been established as fact.

employer covering those costs, as had been the arrangement between Dunn and CGBDS since the execution of the 2011 Share Sale Agreement and Employment and Non-Compete Agreement. What is more, Dunn would no longer have authority over commission splits nor, apparently, would he be entitled to a share of the commissions earned by the other former DMH agents from the sale of insurance as was the case prior to September 2020.

In response, it appears that Dunn and his son, Mason Dunn,[6] declined to become AgriSompo agents. In addition, six (6) other support employees, sometimes referred to as "processors," also declined future employment with Agrisompo and were informed that their employment would be terminated. But it also appears AgriSompo agreed to pay these processors, namely Plaintiffs Kate Dunn, Beverly Short, Lisa Flautt, Meredith Favi and Mileah Williams, significant severance benefits provided they remained in employment through September 30, 2021, in order to complete certain time sensitive crop insurance sale duties.

These processor employees assert that AgriSompo prematurely terminated them in bad faith on or about August 26, 2021, in order to avoid making the agreed upon severance payments despite their having completed the remaining crop insurance sales duties. The reason given for their premature terminations was apparently that the processors had recently attended a continuing licensing education program sponsored by a competitor of Defendant. Specifically, Plaintiffs contend they were terminated on August 26, 2021, when a "task force" of AgriSompo employees, led by Vice President William Moore, who was accompanied by Manager Danny Flynn, Amy Robertson, Heather Zulauf and approximately eight (8) other people, including two armed "security guards," traveled to Clarksdale and terminated them effective immediately.

---

[6] The Court has been advised by all counsel that Plaintiff Mason Dunn is no longer pursuing a claim, though no party has yet sought his formal dismissal from this case.

Plaintiffs also contend AgriSompo terminated Dunn's employment at the same time with written notice to Dunn as follows:

**VIA HAND DELIVERY**

August 26, 2021

Mr. Milton "Pete" Dunn
320 W. Lee
Clarksdale, MS 38614

Re: Notice of Termination & Your Continuing Legal Obligations to AgriSompo North America

Dear Mr. Dunn,

It has come to our attention that on August 6, 2021, you downloaded yield reports and schedules of insurance totaling 2,876 pages related to insureds of AgriSompo North America, Inc. and American Agri-Business Insurance Company (together with their affiliates, "AgriSompo") and that, during the period from July 9, 2021 through August 5, 2021, you downloaded an additional 9,622 pages of yield reports and schedules of insurance related to insureds of AgriSompo. In addition, upon information and belief, you have solicited insureds of AgriSompo for the purpose of moving such insureds' business from AgriSompo to one or more direct competitors of AgriSompo.

There is no valid business reason for you to have downloaded AgriSompo's proprietary and confidential information and we believe that there is a strong likelihood that you have used- and intend to continue to use AgriSompo's proprietary and confidential information for unlawful purposes. Please be advised that the foregoing actions are in direct contravention of your contractual obligations contained in your Employment and Non-Compete Agreement and the Contract of Sale dated May 26, 2011, as well as your common law duties and obligations to AgriSompo (including without limitation the duties of loyalty and confidentiality).

Accordingly, your employment with AgriSompo is ***TERMINATED EFFECTIVE IMMEDIATELY***. . . .
. . . All of the circumstances surrounding your recent activities remain under investigation and be assured that AgriSompo will take all steps that it deems reasonably necessary to protect its confidential business information, as well as its goodwill and business in general.

. . . Please take notice: it is very important that you ***DO NOT*** delete, transfer alter or view any documents, files, or electronic data relating to the business of AgriSompo without explicit written instructions from AgriSompo. Failure to abide by these demands and instruction could expose you to additional claims, including spoliation of evidence.

In addition, please be advised that we will be informing those of our competitors who we believe are the potential indirect beneficiaries of your appropriation of AgriSompo's proprietary and confidential information.

Lastly, because litigation is reasonably foreseeable, demand is also made that you immediately preserve and maintain all documents (including any electronically stored information) that may potentially be relevant in the anticipated litigation regarding the foregoing conduct. . . . Your failure to maintain and preserve potentially relevant documents will result in AgriSompo seeking sanctions, costs, attorneys fees, and adverse jury instructions, as well as any other remedies available. We strongly recommend that you consult a lawyer with respect to this legal obligation.

AgriSompo must and does reserve all its legal rights concerning these matters and while its investigation continues.

Ex. 15 to [82].

On the same date, AgriSompo wrote one of its competitors, Farmers Mutual Insurance

Co. of Iowa as follows:

Re: Milton "Pete" Dunn & AgriSompo North America Business

 Dear Mr. Rutledge,

Please be advised that, effective August 26, 2021, Milton "Pete" Dunn is no longer employed with AgriSompo North America, Inc. ("AgriSompo").

We have good reason to believe that Mr. Dunn has been in contact with, or is otherwise planning to be in contact with, your company for the purpose of transferring or attempting to transfer MPCI policies from AgriSompo for insureds that were serviced while Mr. Dunn was employed at AgriSompo. To the extent that is the case, you should be aware that AgriSompo intends to take all reasonable steps to preserve its relationships with its insureds and to enforce certain contractual and other obligations owed by Mr. Dunn to AgriSompo. Those steps are very likely to involve litigation.
This letter should serve as notice to you that . . . unlawful or tortious interference with AgriSompo's contracts with Mr. Dunn (or AgriSompo's contracts with any of any of its insureds, for that matter) will be addressed by AgriSompo as well.

To be clear, confidential and proprietary business information at AgriSompo belongs to AgriSompo.

Lastly, because litigation is reasonably foreseeable, demand is also made that you immediately preserve and maintain all documents (including any electronically stored information) that may potentially be relevant in the anticipated litigation regarding the foregoing conduct. . . . . Your failure to maintain and preserve potentially relevant

documents may result in AgriSompo seeking sanctions, costs, attorneys' fees, and adverse jury instructions, as well as any other remedies available.

Ex. 18 to [82].[7]

### **The Complaint**

Approximately six weeks after the August 26, 2021, terminations, Plaintiff Dunn, individually, filed the instant action in the Circuit Court of Holmes County on October 22, 2021. The action was promptly removed to this court based on diversity jurisdiction. In relevant part, the original complaint [2] alleged the following as facts:

6. Plaintiff and three other individuals were shareholders of Dunn, Marley & Harris Agency, Inc., a crop insurance agency.

7. In 2011, CGB Diversified Services, Inc. ("Diversified") acquired the stock and other assets of Dunn, Marley & Harris Agency, Inc. from Plaintiff and the agency's other shareholders.

8. Plaintiff entered into a Contract of Sale with Diversified. . .

10. Section 40 of the Contract of Sale provides, in pertinent part:

40. Covenant Not to Compete. As a condition of Purchaser's obligations under this agreement, and to the extent that the Purchaser has not committed a material and continuing breach of this agreement, each Seller or key employee shall agree that, while each Seller or key employee is employed by Purchaser and for a period of two years commencing on the last date of employment with Purchaser, and assuming the Purchaser complies with all provisions of this Agreement and does not sell its crop insurance division to another party, said Seller or key employee will not, directly or indirectly, within the existing marketing area of the Corporation, enter into or engage generally in direct competition with the Corporation in the business of insurance. . . . (emphasis added).

17. In 2020, Diversified sold its crop insurance division to Defendant AgriSompo North America, Inc.

18. After Diversified's sale to Defendant, Plaintiff became an employee of Defendant.

---

[7] A duplicate letter was apparently addressed to another AgriSompo competitor, Hudson. With respect to both letters addressed to AgriSompo competitors, the Court is informed that AgriSompo takes the position the letters were never signed and delivered to the addressees. Plaintiff Dunn disputes this.

19. Diversified's sale of its crop insurance division to Defendant thereby rendered the restrictive covenant of Section 40 of the Contract of Sale unenforceable or inapplicable according to its own terms.

20. The Contract of Sale was not assignable absent prior written consent of the other party except for an assignment incident to a merger, consolidation, or reorganization of either Plaintiff or Diversified.

21. Diversified's sale of its crop insurance division to Defendant was not a merger, consolidation, or reorganization.

22. The Employment and Non-Compete Agreement was not assignable.

23. At no time did Plaintiff enter into any agreement with Defendant that would restrict him from competing with Defendant after his termination from employment with Defendant.

24. On August 26, 2021, Defendant terminated Plaintiffs employment.

25. Shortly after Plaintiffs termination, Defendant sent one or more "cease and desist" letters to various companies in the crop insurance industry advising that Plaintiff was subject to certain restrictive covenants that prohibited him from competing with Defendant.

26. Upon information and belief, Defendant has communicated with other businesses and individuals in the crop insurance industry in Mississippi and elsewhere and advised that Plaintiff is subject to a restrictive covenant that would prohibit him from competing with Defendant.

State Court Compl. [2] at 2-4.

In Count One (the declaratory judgment action), Plaintiff sought a declaration pursuant to Miss. R. Civ. P. 57 that neither the Contract of Sale nor the Employment and Non-Compete Agreement contain enforceable or applicable restrictive covenants prohibiting Plaintiff Milton Dunn from competing with Defendant AgriSompo.

In Count Two (the tortious interference count), Plaintiff claimed:

30. After terminating Plaintiff on August 26, 2021, Defendant intentionally and willfully communicated with individuals and businesses in the crop insurance industry to warn or caution them about hiring Plaintiff.

31. Defendant's actions were calculated to prevent Plaintiff from earning a living in the crop insurance industry when Defendant knew that Plaintiff was not bound by any restrictive covenant not to compete with Defendant.

32. Defendant's anti-competitive and unlawful actions were without justifiable cause because the terms of the Contract of Sale with respect to its restrictive covenant no longer applied as a result of Defendant's purchase of Diversified's crop insurance division.

33. Plaintiff has suffered and continues to suffer loss and damages as a result of Defendant's actions in the crop insurance industry asserting that Plaintiff is subject to a non-compete agreement with Defendant.

[2] at 5. In Count Three, Plaintiff sought to recover alleged earned but unpaid commissions on the sale of crop insurance, and in Count Four, Plaintiff sought injunctive relief against Defendant. [2] at 5-6. The court has been advised by the parties that the claims made in Count Three as it relates to unpaid commissions and all of Count Four have been abandoned.[8]

**The Amended Complaint**

On August 23, 2022, Plaintiff amended his complaint [35] to clarify that the declaratory judgment relief was sought pursuant to 28 U.S.C.A. § 2201(a) and Fed R. Civ. P. 57, to add to Count Two that his tortious interference claims were also premised on the non-assignability of the noncompete provisions of the share sale contract and the employment and non-compete agreements between Dunn and CGBDS, and to add six additional plaintiffs (the processors) who assert a claim for breach of their severance agreements.

In addition, all Plaintiffs, including Dunn, assert by way of the amended complaint, a claim for intentional infliction of emotional distress arising from their termination and failure to honor the severance agreements.

---

[8] However, no party has yet formally moved to dismiss these claims.

12

On January 20, 2023, Plaintiffs moved to again amend their complaint. This time, Plaintiffs sought to amend to specifically allege that the language of paragraph 40 of the share sale agreement was ambiguous. The motion was opposed, and the court, noting that in Mississippi ambiguity is not required to be plead, denied the motion. *See* Order [61].

**<u>Discovery</u>**

Discovery in the case has involved a number of depositions, including that of James McClelland, the vice-president, negotiator, and signatory on behalf of CGBDS to the Share Sale Agreement, as referenced above, and that of Danny Flynn, Defendant's General Manager. Flynn, according to Plaintiffs, has testified that shortly before their termination on August 26, 2021, AgriSompo, through its Vice-President, Moore, had been specifically advised by Flynn that the primary basis for the termination of Dunn—the downloading of a large number of documents including insureds' yield reports and schedules—was in keeping with the long-standing customary practice of the agency and was no indication of any sinister motive. Dunn Dep., Ex. 2 to [82] at p. 69, ll. 23-25; p. 70, ll. 1-7; p. 81, ll. 1-25; p. 82, l. 1; Flynn Dep., Ex. 16 to [82] at p. 36, ll. 1-19; p. 37, ll. 4-15; p. 42, ll. 11-16.

Additionally, as concerned the alleged "disloyal" act of the processors attending a continuing education program offered by another company, Flynn testified that the same was not prohibited by any policy of former or present management, and like the annual practice of printing voluminous data, it was common practice. Flynn Dep., Ex. 16 to [82] at p. 37, ll. 12-25, p. 38, ll. 1-3. Nevertheless, Moore ignored Flynn's information as to both purported bases and proceeded with the terminations. *Id*. at p.42, ll. 11-16.

By way of initial disclosures of core information pursuant to Fed. R. Civ. P. 26, the following information is required to be provided:

A COMPUTATION OF EACH CATEGORY OF DAMAGES CLAIMED BY THE DISCLOSING PARTY-WHO MUST ALSO MAKE AVAILABLE FOR INSPECTION AND COPYING AS UNDER RULE 34 THE DOCUMENTS OR OTHER EVIDENTIARY MATERIALS UNLESS PRIVILEGED OR PROTECTED FROM DISCLOSURE, ON WHICH EACH COMPUTATION IS BASED, INCLUDING MATERIALS BEARING ON THE NATURE AND EXTENT OF INJURIES SUFFERED

As concerns his damages for the tortious interference alleged by Dunn, the only information provided by him responsive to the requirement for a damage calculation was as follows:

2. Lost past and future income- TBD, Plaintiff was and is being denied by Defendant the ability to earn income in his chosen field by the wrongful acts of Defendant. These damages are continuing in nature and must be calculated by experts to be designated, but Plaintiff presently believes these damages to be in excess of $2,000,000.00

3. Punitive damages for Defendant's intentional and willful misconduct- TBD by jury at trial, no less than $2,000,000.00

4. Costs, attorney fees, and discretionary costs - TBD.

5. Such other and further relief to which Plaintiff may be entitled- TBD

See Pete Dunn's Pre-discovery Disclosure of Core Information, dated July 7, 2022.

Dunn's Pre-Discovery Disclosure of Core Information was supplemented on November 11, 2022, to add as related to his required calculation of damages:

6. Defendant has failed to produce 2021 "private product" (i.e. hail and replant) and MPCI true-up schedules for Mason Dunn and Milton D. "Pete" Dunn for all offices in which Plaintiffs were associated. Under the terms of the 2011 contract of sale, Plaintiff Milton D. Pete Dunn had the sole authority to designate commission splits for agents in his offices. Plaintiffs entered the commission split information in the computer software of CGB Diversified (and later defendant) for both MPCI and private products. In 2020, commission splits were adjusted to reflect a new internal procedure of CGB Diversified which limited commission splits to no more than two agents. From 2020 through 2021, Plaintiff Mason Dunn was to receive 100% of all private product commissions previously held by Plaintiff Milton D. "Pete" Dunn. Defendant confiscated the hard copy ledger with hand-written commission splits for both MPCI and private products in the August 2021 raid of

14

their office and has failed to produce a copy of the same to Plaintiffs, which is necessary to check the accuracy of the commission shares reflected in the policy registers. Plaintiff Mason Dunn received less than the total private product commissions due him for 2020 and 2021. Both Milton D. "Pete" Dunn and Mason Dunn have been shorted commissions for 2020 and 2021 due to Defendant's unilaterally changing their commission shares from those designated by Mr. Dunn, which are reflected on the documents Defendant refuses to produce.

Finally, Plaintiff's Revised and Amended Pre-Discovery Disclosure of Core Information, dated March 10, 2023, stated in relevant part as follows:

PETE DUNN

2. Lost past and future income- TBD, Plaintiffs were and are being denied by Defendant the ability to earn income in their chosen field by the wrongful acts of Defendant. These damages are continuing in nature, but Plaintiffs presently believe these damages to be in excess of $2,000,000.00.
3. Punitive damages for Defendant's intentional and willful misconduct- TBD by the Court.
4. Costs, attorney fees, and discretionary costs - TBD.
5. Such other and further relief to which Plaintiffs may be entitled- TBD.

No experts were designated by either party, and discovery in this case concluded on April 19, 2023. A non-jury trial is set for October 16, 2023.

### **The Instant Motion for Summary Judgment**

It is against this backdrop that Defendant has moved for summary judgment asserting, with respect to Counts One and Two (the declaratory judgment action and the tortious interference claims), that:

1) the September 2020 sale of all of the stock of CGBDS by its parent, Enterprise, Inc., to Endurance was not a sale by CGBDS of its "crop insurance division" and therefore did not void the noncompetition provision set forth in paragraph 40 of the Share Sale Agreement between Dunn and CGBDS; and

2) Dunn cannot make a prima facia case of tortious interference with business because he cannot establish that AgriSompo's complained of actions were unjustified under the

circumstances, and in any event, Dunn has failed to adequately demonstrate damages, an essential element of such a cause of action.

As grounds for summary judgment on the remaining claims—that for denial of severance benefits by the processing Plaintiffs (Count Three) and all Plaintiffs' claim for intentional infliction of emotional distress (Count Five), Defendant asserts that:

1) a condition precedent to payment of the severance benefits was that those employees remained in Defendant's employ through September 30, 2021, and they did not (due to no bad faith conduct of Defendant); and

2) the conduct complained of is not sufficiently outrageous to give rise to a claim for intentional infliction of emotional distress.

### **Plaintiffs' Response in Opposition**

In response to the motion for summary judgment, Plaintiff argues with regard to Counts One and Two:

1) that the sale of the CGBDS shares was a sale of the CGBDS crop insurance business/division so as to void the non-compete of the Share Sale Agreement; and/or

2) that paragraph 40 of the Share Sale Agreement (the noncompetition provision) is ambiguous so as to invite reference to the testimony of the parties to that contract concerning the intent or meaning of the language used (namely the testimony of Dunn and McClelland that the language used meant the non-compete obligation was void if there was a change of control or ownership of CGBDS); and/or

3) the non-compete provision was never assignable or assigned by CGBDS to Defendant; and/or

4) Dunn simply has no contractual obligation to AgriSompo whatsoever; and

5) The Share Sale Agreement itself expressed the intent that the non-compete provision in paragraph 40 be a personal covenant flowing only to the original oblige (CGBDS) therein; and

6) That Defendant terminated Dunn in bad faith thereby making any non-compete otherwise applicable unenforceable; and

7) The cessation of the business of CGBDS terminates any restrictive employment covenant that might otherwise have been enforced; and

8) Dunn has satisfactorily demonstrated damages to support a two million dollar estimated two-year damage claim by disclosing his 2016-2021 tax documents revealing an annual crop insurance sales earning before his termination of approximately one million dollars. Further, Dunn argues that any shortfall in his proof as to damages is due to Defendant wrongfully withholding discoverable information necessary to make his damage calculation more specific.

With respect to the Defendant's argument that a condition precedent to the processors receiving the promised severance benefits was that they remain employed until September 30, 2021, processors argue that they were wrongfully precluded from satisfying any such condition by the Defendant who prematurely terminated them in bad faith to avoid the payments; or alternatively, that the only condition precedent that was applicable to their receiving severance benefits was their completion of that year's office crop sales insurance work on or before September 30, 2021—and that they satisfied that condition.

Finally, with respect to the claim of Plaintiffs for intentional infliction of emotional distress, they argue that their firing was knowingly unjustified, citing in support thereof the testimony of Danny Flynn, AgriSompo Manager, for the proposition that he knew the firing was unjustified in that the conduct complained of was in keeping with the regular practice of the processors and was

17

not misconduct. Moreover, Flynn told his superior responsible for the terminations as much prior to the terminations being carried out.

Plaintiffs also assert there are other material issues of fact as to whether the elements of the intentional infliction of emotional distress claim have been satisfied. They rely for this position on the juxtaposition of Defendant's assertion that they were "merely subjected to the ordinary and routine process of being terminated without prior notification following an investigation into their misconduct" ([77] at p. 26) with the processor Plaintiffs' position, as illustrated principally by the testimony of one of them as follows:

> I was seven months pregnant, and they come in and fired me and I have no insurance. I was bawling crying. . ... We went outside where I'm freaking out crying, how am I going to survive? I had just done IVF to have my baby and spent $25,000.00 and I'm getting fired and have no insurance. Mason had just had a heart attack. Lisa's husband has cancer. Yeah. We were all sitting in the car freaking out.

Williams Dep., [82] at Ex. 11, p. 10, ll. 6-8; 21-25; p. 11, l. 1.

### **The Reply**

By way of reply, Defendant argues that there is no patent or latent ambiguity in the noncompetition provision of paragraph 40 of the Share Sale Agreement; thus, the extrinsic testimony of McClelland and Dunn about the intent and meaning of that provision is irrelevant. Defendants' position on this point is that the 2020 sale of the stock of CGBDS to Enterprise was not a sale by CGBDS of its crop insurance division, and thus, did not void the subject non-compete. Alternatively, Defendant argues that its assessment that the non-compete remained in effect and enforceable by it was, if not found legally correct, at the very least justifiable under the circumstances. As concerns Dunn's damage estimate, Defendant denies that it has withheld any discoverable information, pointing out that Dunn never moved to compel any such information while discovery was ongoing.

Finally, with respect to Plaintiffs' claim that they have incurred extreme emotional distress, Defendant again argues that this claim falls far short of the high bar in Mississippi for a claim of intentional infliction of emotional distress.

## Relevant Law

### Standard of Review

Summary judgment is appropriate only when a court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Federal Ins. Co. v. Ace Property & Casualty Co.*, 429 F.3d 120, 122 (5th Cir. 2005). It is well established that all facts must be viewed in the light most favorable to the nonmoving party. *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005). A court may not make credibility determinations or weigh the evidence. *Anderson,* 477 U.S. at 255. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

Before it can determine that there is no genuine issue for trial, a court must be satisfied that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990) (the nonmovant must set forth specific facts to contradict the specific facts set forth by the movant, general averments are not sufficient).

19

To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "A genuine dispute of material fact means that evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC&R Tres Arboles, LLC*, 736 F.3d 396, 400 (5th Cir. 2013) (quotation omitted). An actual controversy exists "when both parties have submitted evidence of contradictory facts." *Salazar-Limon v. Houston*, 826 F.3d 272, 277 (5th Cir. 2016) (quotation omitted). Summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011).

### **Restrictive Covenants**

"Because such noncompetition agreements restrict the exercise of gainful occupation, they constitute a restraint of trade and will be 'cautiously considered, carefully scrutinized, looked upon with disfavor, strictly interpreted and reluctantly upheld' by the courts." Hall, Jennifer, 5 MS Prac. Encyclopedia MS Law §43:46 (3d ed.) (quoting *Thames v. Davis & Goulet Ins., Inc.*, 420 So. 3d 1041, 1043)). Nevertheless, our courts recognize that where the purpose of such a provision is to prevent an employee of a company, who has serviced its clients or customers and been provided with product information and experience as part of his employment from terminating the arrangement and poaching the former employer's customers non-competition agreements properly limited in time and scope are not an unjust restraint of trade. *Redd Pest Control Co. v. Heatherly*, 157 So. 2d 133, 136 (Miss. 1963).

It is equally accurate that where a covenant not to compete specifically expresses an intent that it be a personal covenant flowing only to the original oblige, it will not be enforced generally.

*Herring Gas Co., Inc. v. Whiddon*, 616 So. 2d 892, 895 (Miss. 1993) (citation omitted). Along like lines is the recognition that '[g]enerally, the termination of an employer's business also terminates the restrictive employment covenant, because the abandonment or termination of the business extinguishes the covenant altogether.'" *NSEM, LLC v. Butler*, 2018 WL 3910961, at *6 (S.D. Miss. Aug. 15, 2018) (quoting *Herring Gas Co., Inc. v. Pine Belt Gas, Inc.*, 2 So. 3d 636, 640 (Miss. 2009)).

### **Contract Construction, Ambiguity, and Extrinsic Evidence**

Under Mississippi law, questions of contract construction and ambiguity are questions of law. *Epperson v. SOUTHBank*, 93 So. 3d 10, 17 (Miss. 2012). "Contractual provisions are ambiguous where they are susceptible of two or more reasonable interpretations, or where one provision is in direct conflict with another provision, or where terms are unclear or of doubtful meaning." *Scott v. Southern Elec. Supply Co., Inc.*, 2013 WL 3280276, at *5 (N.D. Miss. June 27, 2013) (quoting *Reece v. State Farm Fire & Cas. Co.*, 684 F. Supp. 140, 143 (N.D. Miss. 1987)) (additional citation omitted). Ultimately, "the primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties." *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (Miss. 2003) (citation omitted). A construction will not be adopted, if it can be reasonably avoided, which will charge the parties with having bound themselves to provisions which are mutually repugnant, senseless, ineffective, meaningless or incapable of being carried out in the overall context of the transaction . . ." *Wilson Indus., Inc. v. Newton Cnty. Bank*, 245 So. 2d 27, 30 (Miss. 1971).

### **Declaratory Judgment**

If a declaratory judgment action is filed in state court, but later removed to federal court, the action converts to one brought under the federal Declaratory Judgment Act. *Kieft v. Pilot Water Sols. LLC*, 2023 WL 4541032, at *2 (W.D. Tex. June 5, 2023), citing *Yor-Wic Constr. Co., Inc. v.*

*Eng'g Design Techs., Inc.*, 329 F. Supp. 3d 320 (W.D. La. 2018). To establish that an Article III case or controversy exists when seeking declaratory relief, "a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Id.*; citing *Bauer v. Tex.*, 341 F.3d 352, 358 (5th Cir. 2003). In other words, "[b]ased on the facts alleged, there must be a substantial and continuing controversy between two adverse parties." *Id.*

### **Tortious Interference with Business Relations**

Under Mississippi law, a tortious interference with business relations claim requires proof of the following four elements: (1) the acts were intentional and willful; (2) the acts were calculated to cause damage to the plaintiffs in their lawful business; (3) the acts were done with the unlawful purpose of causing damage and loss without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) actual loss and damage resulted. *Multiplan, Inc. v. Holland*, 2018 WL 1571908, at *1 (S.D. Miss. Mar. 30, 2018); citing *PDN, Inc. v. Loring*, 843 So. 2d 685, 688 (Miss. 2003).

#### *Intent*

Whether the defendant's acts were intentional or willful does not require an outright confession to that effect, but rather may be inferred. *Id.* Actual notice is implied only when the known facts are sufficiently specific to impose the duty to investigate further and when such facts furnish a natural clue to the ultimate fact; implied notice arises from an inference of fact. *King Lumber Indus. v. Cain*, 209 So. 2d 844, 848 (Miss. 1968).

#### *Damages Generally*

Concerning the claimed loss, the Mississippi Supreme Court has said, "The remedy for the tort [of tortious interference with business relations] is damages, and the plaintiff must also show (1) a loss, and (2) that defendant's conduct caused the loss." *See Cenac v. Murry*, 609 So. 2d

22

1257, 1271 (Miss. 1992) (emphasis added) (citing Prosser & Keeton, The Law of Torts, § 130, 141 (5th ed. Supp. 1988)); *McBride Consulting Svc., LLC v. Waste Management of Miss., Inc.*, 949 So. 2d 52, 65 (Miss. Ct. App. 2006).

Judge Guirola succinctly summarized the present law on damages for tortious interference in *Multiplan, Inc.*, 2018 WL 1571908, at *1 (S.D. Miss. Mar. 30, 2018), wherein he noted that:

> "[A]ctual damage and loss is a required component of the tort of interference with business relations." *Biglane v. Under the Hill*, 949 So. 2d 9, 17 (Miss. 2007). Furthermore, "the plaintiff must provide hard proof of financial loss. Speculative losses will not suffice." Johnny C. Parker, Mississippi Law of Damages § 35:19 (3d ed. 2003) (citing *Cenac*, 609 So. 2d at 1272 (Miss. 1992)). Generally, such loss is proved by showing a loss of business or profit. *See Cenac*, 609 So. 2d at 1272.

*Multiplan, Inc.*, 2018 WL 1571908, at *1 (S.D. Miss. Mar. 30, 2018).

As to the loss, Mississippi law requires proof of actual damages, which are synonymous with 'compensatory' damages; they are substantial, rather than nominal." *Biglane v. Under the Hill Corp.,* 949 So.2d 9, 17 (Miss. 2007) (citing *ACI Chems., Inc. v. Metaplex, Inc.,* 615 So. 2d 1192, 1202 (Miss. 1993). Conclusory statements and speculative allegations of loss, as opposed to proof of actual damages, will not suffice at the summary judgment stage. *Russ v. Safeco Ins. Co. of Am.*, 2013 WL 1310501, at *10 (S.D. Miss. Mar. 26, 2013); *see also DIRECTV, Inc. v. Budden,* 420 F.3d 521, 531 (5th Cir. 2005) (finding a litigant's attempt to create a fact issue via a conclusory and self-serving affidavit to rest on unsteady ground). Put simply, "a damage award cannot be based on mere speculation." *Par Indus., Inc. v. Target Container Co*., 708 So. 2d 44, 50 (Miss. 1998). The Mississippi Supreme Court has stated that "while the measure of damages need not be perfect, the most accurate and reliable evidence available should be required." *Caver v. Brown*, 818 So. 2d 376, 379 (Miss. Ct. App. 2002), citing *City of New Albany v. Barkley,* 510 So. 2d 805, 807 (Miss. 1987).

Under Mississippi law, attorney's fees and expenses cannot be awarded as compensatory

damages. *Multiplan, Inc.*, 2018 WL 1571908, at *3 (S.D. Miss. Mar. 30, 2018). Furthermore, even if attorney's fees and expenses could be awarded as damages, the attorney's fees and expenses incurred in prosecuting a claim for tortious interference with business relations would not qualify as damages suffered as a result of the alleged tortious interference with business relations. *See id.*

### The Duty to Disclose and Compute Damages

"Under established Mississippi caselaw, evidence of every element of damages which one seeks is a prerequisite to recovery." *David v. World Marine, L.L.C.*, 647 F. App'x 461, 466-67 (5th Cir. 2016), citing *Encyclopedia of Mississippi Law* § 25:47 (2015). The disclosure required is more than undifferentiated financial statements without any explanation; the Rule requires a computation supported by documents. *See e.g.*, 10 Fed. Proc., L. Ed. § 26:44.

Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii), a party must, at the outset of litigation without awaiting a discovery request, provide the opposing party:

> (iii) a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

Fed. R. Civ. P. 26(a)(1)(A)(iii). The rule provides that a "party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." Fed. R. Civ. P. 26(a)(1)(E). *Mandawala v. Baptist Sch. of Health Pros.*, 2022 WL 17835056, at *3 (W.D. Tex. Dec. 21, 2022), *reconsideration denied,* 2023 WL 2531738 (W.D. Tex. Mar. 14, 2023).

Further, Rule 26(e) requires that a "party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure response." *Id.*, citing Fed. R. Civ. P. 26(e); *Mills v. Beech*

*Aircraft Corp.*, 886 F.2d 758, 764 (5th Cir. 1989). Supplemental disclosures shall be made "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Id.*, citing Fed. R. Civ. P. 26(e).

In the early stages, "the plaintiff ought to be able to compute the underlying damages sought in the complaint, if only to support the complaint's allegation that the amount in controversy exceeds the minimum jurisdictional amount." 10 Fed. Proc., L. Ed. § 26:44, citing *Jones v. Kemper Ins. Co.*, 153 F.R.D. 100 (N.D. Miss. 1994). Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that "if a party fails to provide information or identify a witness as required by Rule 26(a) or (c), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Written in mandatory terms, Rule 37(c)(1) was adopted in 1993 to give "teeth to a significantly broadened duty' to comply with case management orders and Rule 26's disclosure requirements." *See Romain v. Governor's Office of Homeland Security*, 2017 WL 2438844, at *8 (M.D. La. 2017). The sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless. *Mandawala*, 2022 WL 17835056, at *4 (W.D. Tex. Dec. 21, 2022). Furthermore, "[t]he law is very clear: evidence that was not properly produced during discovery cannot be used to support or oppose summary judgment." *Morris v. Copart*, 2016 WL 6608874, at *3 (E.D. Tex. Nov. 9, 2016).

**<u>Breach of Agreement to Pay Severance Benefits</u>**

"In any suit for breach of contract, the plaintiff has the burden of proving by a preponderance of the evidence the existence of a valid and binding contract, that the defendant has

broken or breached it, and that the plaintiff has suffered monetary damages as a result." *Garner v. Hickman*, 733 So. 2d 191, 195 (Miss. 1999). Furthermore, "Where a contract is performable on the occurrence of a future event, there is an implied agreement that neither party will place any obstacle in the way of the happening of such event, and where a party is himself the cause of the failure he cannot rely on such condition to defeat his liability." *Id.*

**<u>Intentional Infliction of Emotional Distress</u>**

Plaintiffs asserting a claim for intentional infliction of emotional distress must show that: (1) the defendant acted willfully or wantonly towards the plaintiff by committing certain described actions; (2) the defendant's acts are ones which evoke outrage or revulsion in civilized society; (3) the acts were directed at or intended to cause harm to the plaintiff; (4) the plaintiff suffered severe emotional distress as a direct result of the defendant's acts; and (5) such resulting emotional distress was foreseeable from the intentional acts of the defendant. *Smith v. City of McComb, Mississippi*, 2017 WL 3687334, at *6 (S.D. Miss. Aug. 25, 2017). "Meeting the requisite elements for intentional infliction of emotional distress is a tall order in Mississippi." *Jenkins v. City of Grenada*, 813 F. Supp. 443, 446 (N.D. Miss. 1993). The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Smith*, 2017 WL 3687334, at *6 (S.D. Miss. Aug. 25, 2017).

Liability for intentional infliction of emotional distress will not be imposed upon an actor for doing no more than exercising his legal rights. *See Raiola v. Chevron USA, Inc.*, 872 So. 2d 79, 85-56 (Miss. Ct. App. 2004). While liability does not extend to "mere insults, indignities, threats, annoyances, petty oppression, or other trivialities," conduct that is "confrontational, physical, demeaning, and embarrassing" may create a jury issue as to a plaintiff's intentional

inflliction of emotional distress claim. *Croft v. Grand Casino Tunica, Inc.*, 910 So.2d 66, 75 (Miss. Ct. App. 2005); *Gamble ex rel. Gamble v. Dollar General Corp.*, 852 So.2d 5, 12 (Miss. 2003).

Nevertheless, the inquiry focuses on the conduct of the defendant rather than the physiological condition of the plaintiff. *Jenkins*, 813 F. Supp. at 446. It is the nature of the act itself—not the seriousness of its consequences—that gives impetus to legal redress. *Id.* Nevertheless, "[a] claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes." *Pegues v. Emerson Elec. Co.*, 913 F. Supp. 976, 983 (N.D. Miss. 1996), *see also, Wilks v. Fedex Ground Package Sys., Inc.*, 359 F. Supp. 2d 539, 544 (S.D. Miss. 2005) (a plaintiff must demonstrate that he is more than simply "very upset").

## Analysis

### Plaintiff Pete Dunn

#### Count I - Declaratory Relief

In paragraph 29 of the complaint, Plaintiffs seek "declaratory judgment pursuant to 28 U.S.C.A § 2201(a), and Fed. R. Civ. P. 57 that neither the Contract of Sale nor the Employment and Non-Compete Agreement contain enforceable or applicable restrictive covenants prohibiting Plaintiff Milton Dunn from competing with Defendant AgriSompo." Am. Compl. [35] at 5. In its motion for summary judgment, Defendant argues that this claim is ripe for summary judgment because there is no genuine dispute that the non-compete provision in Paragraph 40 of the Contract of Sale was ever voided because CGBDS never sold its crop insurance division to another party. [77] at 11.

Despite briefing on the issue, I find Dunn's claim for declaratory judgment is moot—an issue the Court may raise *sua sponte*. *Kieft*, 2023 WL 4541032, at *2 (W.D. Tex. June 5, 2023), citing *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329 (5th Cir. 2002) (Benavides,

J., concurring) ("Of course, the jurisdictional issue of standing may be raised *sua sponte* despite the parties' failure to raise it."). To establish that an Article III case or controversy exists when seeking declaratory relief, "a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Bauer*, 341 F.3d at 358. In other words, "[b]ased on the facts alleged, there must be a substantial and continuing controversy between two adverse parties." *Id.*

Here, no present controversy exists for Dunn's declaratory judgment claim because any non-competition clause expired, at the latest, two years from the date of Dunn's termination, on or about August 26, 2021. And with no current, live controversy, the Court lacks jurisdiction over that claim. *See id.;* citing *Carr v. Saucier*, 582 F.2d 14, 16 (5th Cir. 1978) ("if the controversy is moot, both the trial and appellate courts lack subject matter jurisdiction."). Thus, Dunn's claim for declaratory judgment should be dismissed as moot.

### Count II - Tortious Interference

First, the Court finds that contrary to Defendant's assertion that the sole basis for Plaintiff's tortious interference claim is that the noncompete provision (paragraph 40) of the 2011 Share Sale Agreement is void due to the 2020 sale of the stock of CGBDS, Plaintiff actually also asserts, in support of this Count, that the noncompetition contractual obligation, whether voided or not, was never assignable or assigned to AgriSompo, and that Dunn never entered any contractual agreement, via assignment or otherwise, not to compete with AgriSompo. On the contrary, apparently the only employment proposal offered by Defendant to Dunn was materially different from the employment contract at issue between Dunn and CGBDS and, in any event, Dunn declined it.

Moreover, the subject of how AgriSompo obtained, if ever, a lawful right to enforce a

noncompetition provision between Dunn and CGBDS Inc. aside, I find that on the record presently available to the Court, the applicable noncompete provision of the Share Sale Agreement is ambiguous. By way of example, while the Share Sale Agreement recites that the noncompetition provision to which Dunn will be bound as a result of his employment with CGBDS will be void if purchaser sells its crop insurance sales division, this begs the question: Did CGBDS have a crop insurance division? And, on this point it appears there is a material dispute as, insofar as the Court can discern, all of CGDBS's business concerned some aspect of crop insurance sales. Other questions also reasonably arise such as, can a wholly owned corporation doing business as divisions, sell one of its divisions or is it restricted to either a sale of only those assets owned by it and utilized in the business conducted by the division or a stock transaction implemented, not by it, but by its parent company? If CGBDS could not sell a division of itself, would the language employed in paragraph 40 to that effect not be meaningless?

There is also the fact that the noncompete provision of paragraph 40 of the Share Sale Agreement merely purports to prohibit Dunn from competing—while it remains in effect—with DMH Inc. in the areas where DMH Inc. is then operating. However, it appears that DMH Inc. is not and has not been in existence for some years. In short, for all of these reasons, summary judgment for Defendant on this count would be improper.

On the other hand, because tortious interference with business expectancy requires—as an element of the claim itself—both proof of no justifiable cause for the complained of conduct and proof that Plaintiff actually suffered damages as result of the complained of conduct, as well as a reasonable, non-speculative, computation of those damages, the Court's finding of ambiguity and the like above does not necessarily save Dunn's claim for tortious interference with business expectancy from an adverse finding on summary judgment. Instead, addressing each of these

additional elements separately, I find, first, that there are material issues of fact as to whether AgriSompo had a legal or at least justifiable basis for engaging in the conduct about which Dunn complains (the communications to Dunn and others related to restrictive covenants in Dunn's contracts with CGBDS). As noted above, the record is not clear as to how or when, if ever, Dunn did or did not incur contractual obligations to AgriSompo, even assuming the same survived the sale by Enterprise of the stock of CGBDS to Endurance and/or the cessation of existence of CGBDS, if any.

I reach a different conclusion however on the issue of whether Dunn has established by a preponderance of the evidence that he incurred damages as a consequence of the complained of conduct and, in particular, has brought forth sufficient evidence of the amount of those damages that was both timely disclosed to Defendant in discovery and is not purely speculative. For the following reasons I find he has not; thus, he has not established an essential element of his claim for tortious interference with business relations.

To begin—we are on the cusp of trial, discovery in this case expired five months ago on April 19, 2023, no party sought to continue same, and the totality of the proof disclosed by Dunn regarding damages consists of his "belief "that his damages are "estimated" for a two-year period at two (2) million dollars. Tellingly, Dunn himself conceded in his own initial disclosures that though he presently "believes these damages to be in excess of $2,000,000.00" they were yet "to be determined" and "must be calculated by experts to be designated" (*see* initial disclosure dated July 7, 2022). And, while Dunn asserts in response to the motion for summary judgment on this point, that his belief in an estimated 2 million dollars in damages is based on a 1099 reflecting annual wages he earned for the 2021 reporting period (prior to his termination from employment) of approximately one (1) million dollars, it is plain that those wages were earned under a

compensation scheme that Dunn would simply not have enjoyed as an independent agent in competition with AgriSompo. For example, those wages were, apparently, in material part earned on split commissions Dunn made on sales by the other agents all pursuant to the compensation provision in his contract of employment with CGBDS, and many/most of those agents are now apparently employed by AgriSompo. Moreover, those wages were earned without Dunn carrying the expenses of the crop insurance sales business or while operating in competition with a large competitor such as AgriSompo.

Further, while Dunn asserts in response to the motion for summary judgment that he believes the customers of other agents employed by AgriSompo would have (and presumably could lawfully have) entered sales contracts with him for the two (2) year period beginning August 26, 2021, but for AgriSompo's complained of tortious interference, he did not disclose the identity of *a single* such customer in discovery, let alone calculate the earnings after expenses he would have earned had he obtained such customer.

In short, as noted above, the law requires a plaintiff such as Dunn to disclose his damages claimed and provide a calculation as to how he arrived at them. He simply has not done so and he may not rely for that omission on the assertion that he needed further information from Defendant, as he suggests in his response, for his wholesale failure to do so. Indeed, the docket reflects Dunn made no effort to obtain any information as to how much damage, if any, he reasonably incurred by reason of the alleged tortious interference by AgriSompo with his ability to lawfully compete with Defendant after his termination on August 26, 2021.

Nor does he address the fact that it was he who filed suit, not the Defendant. In fact, the only actions on which Dunn relies in support of his claim that AgriSompo unlawfully interfered with his ability to compete for any crop insurance sales business, aside from the termination letter

31

AgriSompo sent him on August 26, 2021, is a letter directed to two AgriSompo competitors (Farmers Mutual and Hudson ), but that letter, even assuming it was actually signed and delivered (a fact that is apparently contested) never expressly asserts that Dunn is contractually obligated not to lawfully compete in crop insurance sales business. Instead, while referencing "certain contractual and other obligations owing by Mr. Dunn to AgriSompo, that letter appears to specifically reference Dunn undertaking to transfer existing policies of AgriSompo insureds, and to potentially usurping proprietary and confidential information of AgriSompo. And, as for the letter from AgriSompo to Dunn himself, it, similarly, nowhere states that Dunn was prohibited from otherwise lawfully competing for crop insurance sales. Rather, in it, AgriSompo asserts that Dunn has contractual obligations to it owing under the 2011 Share Sale Agreement and the employment and noncompete agreement, but stops short of specifying the same.

Rather, the letter complains specifically that Dunn downloaded over 10,000 pages of confidential and proprietary information and, while still employed with AgriSompo, used that information in violation contractual obligations and common law duties in order to solicit insureds of AgriSompo to move their existing business to competitors of AgriSompo. Moreover, it was Dunn who apparently voluntarily abandoned his claim against AgriSompo for preliminary injunction which, assuming the claim's validity, would have expressly prohibited AgriSompo from interfering with his ability to make lawful crop insurance sales. For the foregoing reasons, summary judgment in favor of AgriSompo is granted as to Dunn's tortious interference with business relations claim.

**Processors**

### **Count III - Count Breach of Agreement to Pay Severance Benefits**

Put simply, there exists a genuine issue of material fact as to whether AgriSompo

unjustifiably (with pretext) made it impossible for the processors to fully perform the severance agreement by terminating them early—but only after they had completed the additional duties for which they had been promised severance benefits. Indeed, according to the deposition testimony of Danny Flynn, who is Manager of AgriSompo, he specifically informed William Moore, the Vice-President who was responsible for the processors' firing, that the purported disloyal conduct of attending a continuing licensing education program at a competitor's place of business was, in fact, not suspect but in keeping with the ordinary course of business as regularly conducted. [82] at 16, Tr. 42. As such, there is a question of fact as to whether the Defendant's stated basis for termination was pretextual. Therefore, the motion for summary judgment as to Count Three is denied.

**Plaintiff Dunn and Processors**

### Count V - Intentional Infliction of Emotional Distress

As discussed above, the bar for meeting the elements of a claim of intentional infliction of emotional distress in Mississippi is high, particularly in the employment termination context. In this case, Plaintiffs allege that the Defendant knew that the purported bases for their terminations were not valid concerns with respect to its long-time regular methods of operation and that they were forcibly removed from the employment premises by two armed security guards. However, the undisputed testimony offered by the Plaintiffs reveals that they were not touched by the two security guards. [76] at Ex. 7, Williams Dep., p. 25, ll. 8-25; p. 26, ll. 21-25; p. 27, l, 1-7; [76] at Ex. 12 K. Dunn Dep., p. 31, ll. 4-10; p. 33, ll. 22-24; [76] at Ex. 2, P. Dunn Dep., p. 102, ll. 5-17; [76] at Ex. 13, M. Dunn Dep., p. 54, ll. 16-25; p. 55, ll. 1-25. And while some of the Plaintiffs claim to have been "aware" (or, are aware *now*) that the two security guards were in possession of handgun, there is no testimony or other evidence that any handgun was unholstered during the

termination process. There is no evidence at all of any use of physical force, physical threat, or a brandished handgun by security personnel.

Here, similar to the Court's finding in *Jenkins v. Grenada*, 813 F. Supp. 443, 447 (N.D. Miss. 1993), I find that although Defendant's treatment of Plaintiffs may have been nerve-racking, upsetting, and even improper, it does not rise to the heightened level of extreme and outrageous. No genuine issue of fact exists to suggest that the circumstances of their terminations was extreme or outrageous "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Smith*, 2017 WL 3687334, at *6 (S.D. Miss. Aug. 25, 2017). Therefore, summary judgment on this count is granted.

## <u>Conclusion</u>

For the reasons stated above, Defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.** The motion is granted, on the basis of mootness, as to Plaintiff Dunn's Count I claim for declaratory relief and is also granted on the Count II claim for tortious interference with business relations, as well as the Count V claim for intentional infliction of emotional distress. The motion is denied as to the processors' claims for severance benefits under Count III.

**SO ORDERED THIS**, the 18th day of September, 2023.

/s/ Jane M. Virden
United States Magistrate Judge