UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

MILTON D. "PETE" DUNN, MASON DUNN,
KATE DUNN, BEVERLY SHORT, LISA FLAUTT,
MEREDITH FAVI, AND MILEAH WILLIAMS                                        PLAINTIFFS

V.                                                   CIVIL ACTION No. 4:21-CV-136-JMV

AGRISOMPO NORTH AMERICA, INC.                                            DEFENDANT

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This matter is before the Court for findings of fact and conclusions of law following a bench trial of the claims of Kate Dunn, Beverly Short, Lisa Flautt, Meredith Favi, and Mileah Williams ( "the processors") As discussed in more detail below, the processors' claims are for breach of agreement by the Defendant, made in the spring of 2021, to pay them certain compensation for their agreement to remain as employees of Defendant through September 30, 2021. The processors claim they were unfairly prevented from remaining so employed and wrongfully denied the promised compensation when they were summarily terminated on August 26, 2021, for having attended continuing education ("CE") training two days earlier at an event sponsored by a competitor of Defendant. In addition to compensatory damages for the alleged breach, processors also seek punitive damages and attorney fees.

The Court's findings and conclusions detailed below mandate a verdict in favor of Plaintiffs on their respective breach of contract claims and a judgment for awardable damages to each based thereon.

<u>Findings of Fact on the Issue of the Merits of the Breach of Contract Claim</u>

Dunn, Marley and Harris, LLC ("DMH") was a crop insurance agency formed in 1997 in Clarksdale, Mississippi. It employed several crop insurance sales agents, including agency

1

founder, Pete Dunn, and their support staff, including even at that early date some (though not all) of the instant Plaintiff processors. As founded, DMH was not an Approved Insurance Provider ("AIP"), meaning it did not offer for sale its own allotted governmentally-approved crop insurance policies, but instead, its agents offered crop insurance policies provided by any number of AIPs.[1]

Like many professions, crop insurance sales agents and processors are required, in order to keep their licenses to work in the field of crop insurance, to receive a certain number of hours of continuing education on an annual basis. CE hours are sponsored by AIPs, as well as other third parties.[2] Certain AIPs offer CE training exclusively for their own employed or "captive" agents and processing staffs. Other AIPs, as well as third parties, sponsor CE hours for all crop insurance agents and processors, regardless of their captive or independent status, and there is no legal requirement that an agent and or processor receive their CE training at an event sponsored by any particular AIP or other third party. Agents and Processors of DMH typically received their CE training anywhere in the general vicinity that such hours, when needed, were being sponsored, irrespective of by whom offered.

In 2011, the stockholders of DMH, including Pete Dunn, sold their shares to an AIP, CGB Diversified Services, Inc., ("CDBDS" or "Diversified") for whom the DMH agents thereafter served as "captive" agents. Therefore, they offered for sale only governmentally-approved policies allotted to Diversified, and Diversified was responsible for all costs associated with such sales, including agent compensation and the cost of employing processors to support the agents. As employees of Diversified, the processors continued to report to Pete Dunn, and

---

[1] As such, DMH was considered an independent, rather than a "captive" crop insurance sales agency, and was responsible for its own costs associated with sales of crop insurance policies, including the cost of employing its processors.

[2] While the crop insurance sales policies offered on an annual basis are available for sale only through certain competing entities, the AIPs referenced above, the policies those AIPs each offer are essentially the same policy.

beginning in 2015, also to Danny Flynn, who served as the general manager for Diversified responsible for management of the DMH agency. As discussed in more detail *infra* page 7, as employees of Diversified, the processors were permitted to obtain their CE hours as needed from whomever and wherever it was convenient to do so. In that regard, Flynn explained that it was considered helpful for the processors to attend CE training at other AIP sponsored events in order to learn what competitors were doing differently.

In late 2020, the stock of Diversified was sold by the parent, CGB Enterprise Inc., to Endurance U.S. Holding Corp. ("Endurance"). The subject processors were initially notified that Diversified would promptly begin doing business as the Defendant AgriSompo North America, Inc. (also known as "Sompo" or "AgriSompo"), and their employment would be terminated. Shortly thereafter, however, Danny Flynn, the former general manager of Diversified, who had now been employed by the Defendant, requested on its behalf, that the subject processors, in particular, agree to remain as employees of Defendant through September 30, 2021, in order to complete critical crop insurance sales reporting tasks for the preceding crop year. According to Pete Dunn, it would have been impossible for new employees of Defendant to step in and timely complete the necessary work:

> Q: Well, if the girls had all quit at the end of June and gone home gotten other jobs, how big a task would it have been for a strange group of people to come in there and try to close out the remaining work on those $45 million worth of policies?

> A: They could not have done it. They could not have done it in the time allowed by federal crop to get the job done. There is a time period in which these reports have to be done so that the bills can go out to the farmers, so everything that – so that everything can be in the system, the bills written, the farmer get a copy of the schedule. It would have been impossible for somebody else who didn't even know the farmers or what to look for. It couldn't have been done.

Q:      And Mr. Flynn specifically asked you and the girls to stay and take care of that business?

A:      Absolutely, he did. And wanted us to stay in the worst possible way.

Tr. [115] at 55-56.

In exchange for their agreement in the spring of 2021 to work for the Defendant until September 30, 2021, the processors were informed they would receive a severance package of special compensation based on their prior years of service with Diversified. By the end of August 2021, the processors had satisfactorily completed at least 90% of the work necessary to finish the complicated crop insurance sales reporting tasks for the preceding year. During this period in 2021, the processors continued to report to and be supervised, on behalf of the Defendant, by both Pete Dunn and Danny Flynn. And, needing their CE hours in order to continue their licenses in the hopes of securing future employment in the processing capacity following their anticipated termination on September 30, 2021, they located a CE event being sponsored by another AIP, FMH, on August 24, 2021, at the Holiday Inn in Southaven, Mississippi. With the blessing of— and in fact, accompanied by one of their Agrisompo bosses at the time, Pete Dunn—the processors attended that CE training.

As discussed in more detail below, the processors were never informed that as employees of Defendant that they would not be permitted to obtain their required CE hours from any source other than the Defendant. The Defendant had (and still has as of the time of trial) no policy stating that its employees could not attend CE's sponsored by another AIP. Nor were the processors ever notified by Defendant that it, as it now contends, itself sponsored a CE event in early August 2021. To the contrary, while the Defendant offered at trial, through its sole witness, that it sent an email to Pete Dunn advising of such a CE offering at some point in 2021, it did not produce any evidence of same. Moreover, Pete Dunn was widely known not to communicate at

4

all through email. Accordingly, he and the processors were unaware of any alleged Defendant-sponsored training event in August 2021.

Less than 48 hours after their attendance at the sponsored CE program—at approximately 8:26 a.m. on August 26, 2023—a group of Defendant's executives, including Danny Flynn, as general manager, Amy Robertson, Senior VP of Human Resources, Heather Zulauf, her HR assistant, and Billy Moore, Regional Vice-President, as well as armed security personnel, appeared unannounced at the office in Clarksdale, Mississippi where the processors and Pete Dunn were at work. After inquiring of the processors whether they had attended the training sponsored by another AIP on August 24, 2021, and being told that they had, the processors were only informed that they were "disloyal" and were terminated immediately, allegedly "for cause." No explanation of why their attendance at the CE training was disloyal was offered. They were paid only wages/vacation earned to date of termination, rather than through the promised September 30, 2021, date, and they were not paid any "years of service" based severance pay.

The processors' claims for breach of contract to pay them the promised compensation were brought on August 23, 2022. Thereafter, Plaintiffs noticed and took the depositions of: Amy Robertson, who was designated by Defendant as its 30(b)(6) designee as a "Person most knowledgeable with regard to the decision to terminate Plaintiffs from their employment with Agrisompo and any purported reasons for said termination;"[3] Heather Zulauf; and Danny Flynn, all referenced above, were taken. Those transcripts were subsequently introduced by the

---

[3] Amy Robertson was also designated as a Person most knowledgeable with regard to the terms of the standard severance package offered by Agrisompo to terminated Agrisompo employees and any variations of said severance package purportedly applicable to Plaintiffs and the negotiations or communication of the terms of said severance package to Plaintiffs in this lawsuit; Person most knowledgeable with regard to the alleged breaches of contractual and common law duties owed by Plaintiffs to Defendant, including the duties of loyalty and confidentiality; and Person most knowledgeable with regard to the internal investigation which you allege revealed conduct in violation of Plaintiffs' contractual and common law duties, including the findings resulting from each investigation.

processors into evidence (in material part) at the bench trial of this action. In addition, each of the processor Plaintiffs and Pete Dunn testified live. Defendant offered only a single witness, Heather Zulauf, who was called live.

Amy Robertson's deposition testimony was, in relevant part, that she was hired by Defendant as an HR assistant in February 2021 and in late August that year learned the Defendant company was concerned about some employees in the Clarksdale, Mississippi office having attended what she understood to be an "agent update meeting" at another AIP. She explained that she and Heather Zulauf were tasked by Defendant to "investigate" their attendance. And, while she explained that she was unaware of any notice, in any form, of the Defendant advising processor employees who were anticipated to become unemployed effective September 30, 2021, in particular, or its employees generally, that they could not attend required training anywhere except that offered by the Defendant,[4] neither she nor Ms. Zulauf made any inquiry as to the circumstances surrounding the processors having attended the update meeting on August 24, 2021. In fact, their "investigation" consisted *only* of inquiring of the processors, on August 26, 2021, whether they had attended the meeting. According to Ms. Robertson, knowing why the processors attended the training was simply "not part of the process." In fact, Ms. Robertson did not know who the AIP sponsoring the training was, or even if some independent instructor or lecturer actually provided the training. And, though she testified she had never heard of an employee of Defendant receiving their required CE hours at another AIP sponsored event, Danny Flynn, who, as noted, was a general manager of the Defendant at the time, testified at his deposition that when he learned that the processors were to be terminated for attending the agent update meeting on August 24, 2021, he specifically informed both Ms.

---

[4] Robertson stated that she personally would not go elsewhere for any training.

Robertson and Mr. Moore—before the termination—that it had long been a routine, sanctioned practice for the processors and agents to get their CE hours by attending others' training seminars. Mr. Flynn explained also:

> Q: And you mentioned they were all interested in whether some continuing education had been taken at some location?
>
> A: Yes, sir.
>
> Q: Anything unusual about that?
>
> A: No, sir.
>
> Q: Did you know Mr. Dunn and the girls at other times in the past to do that if they needed their yearly course of continuing education?
>
> A: Yes, sir. And they were allowed to do that. And then they would report back to us as well things that were going on in other AIPs and what was better and what was worse.

Flynn Dep. [110] at 38-39. At the bench trial of this action, Pete Dunn similarly testifed:

> Q: Anything at all unusual or different or sinister about
> them [the processors] going to a training session with some other provider?
>
> . . .
>
> A: That was not unusual to do.
>
> Q: Was that done in the past –
>
> A: Absolutely.
>
> Q: --by your girls and by you?
>
> A: Yes.
>
> Q: Was Mr. Flynn aware of that?
>
> A: Yes.
>
> Q: And did anybody, to your knowledge, before August 26, [2021] ever come in and ask you -- well, did anybody even ask the girls if this is true, did you go there, before August 26, when they all showed en masse?
>
> A: Not to my knowledge.

7

Q:      You had heard nothing about it?

A:      No.

Q:      Was there any prohibition about it anywhere in Diversified materials, in Sompo [defendant's] materials that you were aware of, Mr. Dunn, that said do not go to somebody else's training program?

A:      No. . . .

Q:      And what about the training, anything that prohibited you and the girls from getting your training from any source that's qualified to give it?

A:      No. . . .

Q:      Now, Mr. Dunn, from the standpoint of the reasons you were fired, the girls were fired, had anybody questioned you about anything before August 26, about talking to somebody, going somewhere, anything? Had you had any contact from Mr. Haney and Mr. Moore questioning why you did something or asking if you did something?

A:      Charlie, it was a complete and total surprise. So, the answer is no.

Q:      And as far as the girls, had any of them been questioned about any of their activities to explain them or give any reason for it?

A:      No.

Tr. [115] at 50-52.

Nevertheless, Defendants' witnesses at deposition testified that the processors were terminated for the sole reason that they attended a training meeting sponsored by another AIP.

Heather Zulauf, Assistant Vice-President of Human Resources, and the other assigned member of the team to investigate the attendance of the processors at the training, testified at her deposition that the purpose of traveling to Clarksdale on August 26, 2021, was, insofar as the processors were concerned, "to seek to understand with the support staff about their attendance at the competitors meeting." Zulauf Dep. [109] at 31. She was asked:

Q:      In other words, you were going to ask them if they went and got CLE or continuing education?

A:      Correct, seek to understand conversation.

Q:      And, if they said yes, they got education, they were going to be terminated as well?

A:      If they attended the meeting of a competitor then, yes, they would be terminated.

Zulauf Dep. [109] at 31.

Despite this, she confirmed she was unaware of anyone previously objecting to or prohibiting employees of Defendant from obtaining CE hours from anywhere other than from the Defendant itself. And, like Ms. Robertson, she confirmed the processors were never asked anything about the training they received August 24, 2021, other than simply whether they attended it.

Each Plaintiff processor testified at the bench trial regarding their attendance at the training update. Ms. Favi testified:

Q:      All right. Tell me about this continuing education.

. . .

Q:      Okay. All right. At this meeting, did y'all – excuse me. Strike that. Did you offer any kind of information to anyone else about how your business was done?

A:      At what meeting?

Q:      At the continuing education?

A:      No.

Q:      Did anyone from your -- any of your co-employees offer any information about how their job was done with this --

A:      No.

Q:      Did you do anything other than simply listen to the updates?

A:      No.

9

Q:      Did you do anything disloyal at the meeting?

A:      No.

Q:      Had you ever been told about any prohibition of going to another company's educational seminar?

A:      No. And can I -- can I -- we did it all the time, and it was never a problem.

Q:      Okay. Did Danny Flynn know that you went to other seminars from time to time?

A:      Yes.

Q:      And did Pete also know that you went to other seminars from time to time?

A:      Yes.

Q:      Had anybody ever expressed any concern or objection to that?

A:      No.

Q:      And Pete was your boss and an employee of Sompo at the time?

A:      Yes.

Q:      All right. Let me make sure that this is abundantly clear. Did you do anything differently in the office closing out the '21 crop year in August of '21 than y'all had done at any year prior?

A:      Absolutely not.

Q:      Did you and your co-employees do what you had been asked to do by Sompo when they made you the request to stay until September 30th?

A:      Yes.

Q:      And did you receive the severance that they had told you you would receive?

A:      No.

Q:      Why is that?

A:      Because they said -- they came in on August the 26th. I don't know how many people were there. Two armed guards came in, closed my -- I had a -- there was an office beside me and there were connecting doors. They made all of us go into my office; shut the doors. Asked if we had been to another AIP's meeting. And Lisa was -- Flautt was the one that said, "Yes, we went to a meeting Tuesday." And they said, "You're fired." "Why are we fired," we asked. "You were not loyal to the company. Get out of the office. Get your purse, belongings; leave. Is that what you did?

A:      Yes.

Q:      Did everyone do the same?

A:      Yes.

Q:      Had you ever been treated like that before?

A:      No.

Q:      Do you think you were disloyal to Sompo?

A:      Absolutely not.

Tr. [115] at 90-94. Beverly Short also testified:

Q:      Okay. Now, we've heard a bunch of stuff about a seminar that was held at a Holiday Inn in Southaven, I believe. Did you attend that?

A:      The CE training?

Q:      The CLE, or the CE, as you call it.

A:      Yes, I did.

Q:      And what was the reason for going up there to that? Why did you go to an educational program?

A:      Well, we did it every year to get our CE hours for our license -- to keep our license up-to-date. And it was time to have that done, so I went.

Q:      Was this the appropriate time of year for you to do it to keep your license in effect?

A:      Yes, sir.

Q:      And was there anything at all unusual, new, or different –

A:      No, sir.

Q:      -- about going to that?

A:      No, sir.

Q:      Now, the fact that it was held by Farmers Mutual, another AIP, or whatever they are called, was that anything unusual or different than you may have done in the past?

A:      Not that I knew of.

Q:      Had anyone ever told you you have to go to only AgriSompo's to get it?

A:      No.

Q:      Had anybody at Diversified ever told you you needed to go to Diversified to get it?

A:      No.

Q:      And did you do anything there, other than receive educational lectures or information from the people putting on the program?

A:      No.

Q:      Did you take any documents, give anybody anything, tell them any trade secrets?

A:      Didn't even take a piece of paper.

. . .

Q:      Had you ever heard anybody forbid you to get CLE from any place before that?

A:      No.

Q:      Had Mr. Barrett or Mr. Flynn or anybody that was over -- or by Mr. Dunn, had any of them ever questioned the ability to get CLE from wherever it was most convenient?

A:      No.

Q:      Beverly, were you told you were being fired for cause?

A:      Because I went to a CE meeting.

Q:    And had you done anything wrong anywhere to be fired for?

A:    No.

Q:    Had you done anything differently than you had done during the eight years you had worked for Diversified?

A:    No.

Q:    The CLE you attended, was that routine and required?

A:    Yes.

Tr. [115] at 122-31. Mileah Williams testified:

Q:    What did you understand the reason to be that you were being fired?

A:    That we went to that meeting.

Q:    And what kind of a meeting was it?

A:    It was an update meeting.

Q:    What was the reason you were attending an update meeting?

A:    I've always gone to them. I worked for Diversified prior to this where I was just a receptionist, and I went to update meetings as well then. We always went to get just updates for the system; how changes were to be made; all the updates regarding crop insurance.

Q:    So they were talking about matters that would impact your job whether you were licensed or not?

A:    Right.

Q:    Had you ever been told that you could not attend a meeting held by another company?

A:    No.

Q:    Have you ever seen that in writing anywhere?

A:    No.

Q:    Had anyone ever told you that?

A:      No.

Q:      Anyone ever object in the past when you went to others?

A:      No.

Q:      Did you assist in the end of the year closeout?

A:      Yes.

Q:      Was it done the same way it had been done for the last five years?

A:      Yes.

Q:      Anything different about it?

A:      No

Tr. [115] at 146-48. Lisa Flautt testified:

Q:      At any time you worked for Diversified, or after Sompo took over, did anybody ever indicate to you that you should not go get your educational credits anywhere you wanted to get them?

A:      No, sir.

Q:      And you had done this previously?

A:      Yes, sir.

Q:      Did Mr. Flynn know you had done that previously?

A:      Yes, sir.

Q:      Did he ever question it or fuss at you about it in the past?

A:      No.

Q:      Was anything done by you or any of the other girls at that meeting that could have in any way whatsoever prejudiced Sompo?

A:      No.

Q:      You didn't take any documents and hand them out or give trade secrets away to anybody?

A:    No, sir.

Q:    So you sat like a student in a classroom and listened to somebody talk about whatever the new changes were or whatever affected you they did?

A:    They have different presenters and they'll put information on a -- you know, a screen and they get out big books, and it's at your disposal there to see what kind of changes there are for the upcoming year for the farmers.

Q:    And you signed in and got credit for attending that meeting on your obligation for both federal and state licenses?

A:    Yes, sir

. . .

Q:    From the time -- let's say from January the 1st of 2021, Lisa, did anything in the office, was anything run any differently or handled any differently than it had been for the ten years before that?

A:    No.

. . .

Q:    When they came and fired you, did they explain anything to you about what supposedly you violated other than just simply asking you if you went to that meeting and then saying you were fired?

A:    No. The only thing -- the only sentence that was said was after they asked was if we had gone through -- if I had gone to a continuing education meeting with another company, and I said, "Yes." They said, "You're fired." And I said, "Why?" And they said, "Because you're not loyal to the company."

Tr. [115] at 175-79. Finally, Katherine "Kate" Dunn testified:

Q:    All right. So tell me about the continuing -- the seminar that y'all went to. Did you attend that?

A:    I did attend it. It was in Southaven. It was a continuing education and update meeting that we go to twice a year.

Q:    Was there anything abnormal or different about this one compared to the ones you've been to in the past?

A:    No.

Q:     Had anyone ever told you that you shouldn't attend another company's
       seminars?

A:     No.

Q:     Had you ever received any employee manual or direction from superiors
       that you shouldn't do that?

A:     No.

Q:     Did your boss or supervisor, Pete Dunn, know -- ever tell you not to do
       that?

A:     Uh, no.

Q:     Okay. Was there anything disloyal about your attending that meeting?

A:     No.

Q:     Was there anything else disloyal about your finishing the job that had been
       requested of you through September 30?

A:     No.

Q:     Did you and your coworkers complete the task that was given to you or
       asked of you to stay and finish out the acreage reporting?

A:     One hundred percent.

Q:     And continue on with whatever work you had to do until September 30th
       until you were terminated?

A:     Yes.

. . .

Q:     Okay. And did -- in your opinion, did you do your job competently and
       loyally up until the point that you were fired?

A:     Yes, I did. We all did.

Tr. [115] at 209-12.

        As noted, the Defendant called only Heather Zulauf at trial. Among the testimony she

offered on direct was the following:

> Q:     At the time the decision was made to terminate those folks, did AgriSompo, you or anyone else, to your knowledge, at AgriSompo believe that these folks were actually attending a quote, unquote continuing education seminar at the request of Farmers Mutual?
>
> A:     We did not know the content of the meeting, no.

Tr. [115] at 250.

Following some confusion as to whether the witness knew what kind of meeting the processors had attended on August 24, 2021, the Court sought clarification. It asked:

> **THE COURT:**     Do you know what kind of meeting they went to?
>
> **THE WITNESS:**     Personally, no, I do not.

Tr. [115] at 270. And, Ms. Zulauf later reiterated this on cross. She testified:

> A     . . . My understanding is that I didn't know what that meeting was.

Tr. [115] at 321.

Despite not understanding what kind of meeting the processors had attended on August 24, 2021, Ms. Zulauf also testified she had not inquired of the processors why they went to the meeting or what the meeting was about—this is despite her deposition testimony that the purpose of traveling to Clarksdale on August 26, 2021, was, insofar as the processors were concerned, "to seek to understand with the support staff about their attendance at the competitors meeting." Zulauf Dep. [109] at 31.

And, regarding the reason the processors were terminated she stated, much like Ms. Robertson had,

> A:     . . . I want to be clear. Like, Pete's situation is separate from the plaintiffs and why they were terminated. All of those reasons aren't why they were terminated. All of those reasons aren't why they were terminated.

Q:      Well, I thought Mr. Duddleston a while ago was trying to go into some big overall sinister thing about all this stuff that made y'all suspicious?

A:      He was. And that's –

Q:      So --

A:       -- not relevant to the letter; right?

Q:      Yeah. But no, the girls -- the only reason you ever gave me on deposition and the only reason anybody has ever given me about the girls is this meeting they went to; right?

A:      Correct.

Tr. [115] at 304.

Finally, Ms. Zulauf testified she was unaware of any notice to employees of Defendant that they were not permitted to get their CE hours at another AIP. She testified with respect to her prior deposition testimony on this point:

Q:      (reading from deposition) . . . Are you aware of anything that said don't go to a meeting -- that another education meeting that's being conducted by another supplier?"
        Your answer:  No."

A:      And I said no.

Q:      And that's still the truth today, isn't it?

A:      I believe so, yes.

Tr. [115] at 324.

### The Law (as Applicable to the Merits of the Breach of Contract Claim)

Under Mississippi law, a plaintiff in breach of contract action has the burden of proving by a preponderance of the evidence: (1) the existence of a valid and binding contract; (2) that the defendant has broken or breached it; and (3) that plaintiff has been thereby damaged monetarily. *Mitchell v. State Farm Fire & Cas. Co.,* 799 F. Supp. 2d 680 (N.D. Miss. 2011). And, "[w]here a

contract is performable on the occurrence of a future event, there is an implied agreement that neither party will place any obstacle in the way of the happening of such event, and where a party is himself the cause of the failure he cannot rely on such condition to defeat his liability." *Garner v. Hickman*, 733 So. 2d 191, 195 (Miss. 1999) (citing *Warwick v. Matheney,* 603 So. 2d 330, 337 (Miss. 1992) (overruled on other grounds)).

More recently, this Mississippi Court of Appeals reiterated: "There exists a 'principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." *Fairchild v. Bilbo*, 166 So. 3d 601, 607 (Miss. Ct. App. 2015) (citing *Morris v. Macione,* 546 So. 2d 969, 971 (Miss. 1989)). Under this "doctrine of prevention," "when a party to a contract causes the failure of the performance of an obligation due, [he] cannot in any way take advantage of that failure." 13 *Williston on Contracts* § 39.3 (4th ed. 2013). Moreover, the doctrine of prevention "provides that when a promisor wrongfully prevents a condition from occurring that condition is excused." *Mendoza v. COMSAT Corp.*, 201 F.3d 626, 631 (5th Cir. 2000); *see also Williston on Contracts* § 39.4 ("If a promisor prevents or hinders the occurrence or fulfillment of a condition to the duty of performance, the condition is excused.").

## Conclusions of Law

Defendant's termination of the processors (prior to their agreed upon termination date of September 30, 2021) was based on a non-published, non-communicated, and non-existent policy alleged to prohibit attendance by Defendant's employees at CE or "agent update meetings" sponsored by anyone other than the Defendant. Furthermore, Defendant's own managerial/supervisory employees at the time, Pete Dunn and Danny Flynn, testified the practice of obtaining CE training wherever available was in keeping with the past-sanctioned activity of

the processors. And worse yet, before the processors were terminated, the Defendant was expressly made aware of that practice and its sanctioning by its own managerial employee, Danny Flynn, who testified he was embarrassed by the terminations. The terminations were made even though the Defendant's employees actually tasked to investigate or "seek to understand" the facts surrounding the processors' attendance at the training, never made any inquiry concerning the meeting other than to ask if they attended one. In fact, Ms. Zulauf testified a trial she had no understanding of what the August 24, 2021, meeting was about. Therefore, I conclude that the termination was unjustified, unreasonable under the circumstances and made in careless disregard for the rights of the processors. Accordingly, and consistent with the authorities cited above, I find in favor of Plaintiffs as to their respective breach of contract claims and a judgment for awardable damages to each based thereon.

## **Damages**

On the issue of what severance pay was promised in the spring of 2021 in exchange for their retention through September 30, 2021, and whether it was one week per year of service (as Defendant contended at trial) or two weeks (as Plaintiffs contended at trial), the testimony was hopelessly confused and contradictory to that given by all in their sworn depositions. And while the Court will spare all parties the exercise of detailing the numerous inconsistencies, suffice it to say that the Defendant's witnesses at three depositions ([108] P7, [109] P8, and [111] P10) unquestionably testified that the severance package promised the Plaintiffs was to be calculated on the basis of two (2) weeks' pay for each year of prior service. Yet, when called live by the Defendant to testify at trial, Heather Zulauf changed her testimony to state, for the first time ever, that it was to have been based on only one week per year of service. The explanation she

provided was indeed curious and perhaps explains the considerable confusion over the one week of pay per year of service versus two weeks issue.[5]

Nevertheless, the processors, who have the burden of proof on the issue, while testifying on direct that they were promised in the spring of 2021 two weeks per year of service, that was unquestionably in direct contradiction to their deposition testimony, which was that they were promised only one week per year of service (and that deposition testimony was consistent with the damage calculation initially provided by the processors to comply with their pre-discovery disclosure obligations.) Moreover, on cross-examination each processor, in effect, conceded that they were either informed in the spring of 2021 when they agreed to continue working through September 30, 2021, that they would receive in exchange a severance package based on one week of pay per year of service, or they had no understanding at all of how the severance package would be calculated. Accordingly, I conclude premised on the fact that it is the processors who bear the burden of proof as to their calculation of damages, that the weight of the evidence, indeed their own testimony, establishes that the processors are entitled to one week of pay per year of service in exchange for their agreement, in the spring of 2021, to work through September 30, 2021.

In addition to the discrepancy between the one week of pay per year of service versus one pay period per year of service, the only other difference between Plaintiffs' and Defendant's

---

[5] Ms. Zulauf testified at trial that she determined to change her testimony from two weeks to one week just weeks before the trial after legal counsel for Defendant informed her that these employees were entitled pursuant to the 2020 contact of sale of Diversified to receive one week of pay per year of service as a severance payment. Though she disavowed any personal knowledge of the terms of the purchase agreement (and it was not offered by any party in evidence), it would appear, based on this testimony, that the processors were already entitled, or may have been, in the spring of 2021 when they were approached and offered by Defendant special compensation in exchange for their agreement to be retained through September 30, 2021, to have been, or perhaps have been, already entitled to another one week of pay, pursuant to another agreement—the 2020 purchase agreement. Of course, inasmuch as the Defendant's only witness at trial herself apparently just learned of the terms of the 2020 purchase agreement about which she testified, presumably the processors were likewise unaware of it and no such breach of that contract claim is before this Court.

calculations are the Plaintiffs' inclusion of interest,[6] and Plaintiffs' argument that they are entitled to a 1.07 percent multiplier of the severance pay and vacation accrued in order to account for the safe harbor and employer match that would allegedly be due to them. However, the Court does not find that Plaintiffs have sufficiently proven entitlement to a 1.07 percent multiplier.

At trial, Ms. Zulauf testified that should the Court rule in favor of Plaintiffs, each of the plaintiffs would be entitled to "one week of pay for every completed year of service and three months of COBRA."[7] [115] Transcript at 244. Ms. Zulauf testified that she and the payroll manager calculated what each of the plaintiffs would have been entitled to had they stayed with AgriSompo through September 30, 2021. The Court finds that the calculations of the processor Plaintiffs' benefits as presented in Ms. Zulauf's testimony are accurate, as she and the AgriSompo payroll manager were in the best position to determine what benefits were owed to the processors. In addition, the Court finds that the processors are entitled to interest at 8% per annum from September 30, 2021, to date of payment. Each of the processors' benefits are addressed below:

**A) Meredith Favi**

Ms. Favi was a full-time employee working 40 hours/week at an hourly rate of $42.53. Ms. Favi had been employed with Defendant for ten years.

---

[6] Defendants do not address the issue of interest; however, the Court finds that the processor Plaintiffs are entitled to same.

[7] With regard to the COBRA "gross up," Ms. Zulauf testified that "there's some employment laws that require when you're doing even as far as severance and mostly out on the East Coast. But they require you to gross up dollars for employees when you're giving them lump sum payments. So as a payroll practice our company working east coast to west coast, always grosses up those dollars." [115] at 281. Plaintiffs' damage calculations do not include the COBRA "gross up." However, because it is an employment practice that the Plaintiffs would have been entitled to had they been allowed to work through September 30, 2021, they are entitled to that amount from Defendant herein.

Had Ms. Favi been employed through September 30, 2021, and received a severance package of one week per year of service and three months of COBRA, she would be entitled to:

| Salary Pay 8/27 – 9/30 | Safe Harbor (8/27 – 9/30) | 401K Employer Match (8/27 – 9/30) | Vacation Accrued (8/27 – 9/30) | Severance (40 hours x $42.53 x 10 years) | 3 months COBRA (grossed up) | **TOTAL** |
|---|---|---|---|---|---|---|
| $8,506.00 | $340.24 | $275.59 | $680.48 | $17,012.00 | $17,154.29 | **$43,968.60** |

### B) Beverly Short

Ms. Short was a full-time employee working 40 hours/week at an hourly rate of $28.77. Ms. Short had been employed with Defendant for nine years.

Had Ms. Short been employed through September 30, 2021, and received a severance package of one week per year of service and three months of COBRA, she would be entitled to:

| Salary Pay 8/27 – 9/30 | Safe Harbor (8/27 – 9/30) | 401K Employer Match (8/27 – 9/30) | Vacation Accrued (8/27 – 9/30) | Severance (40 hours x $28.77 x 9 years) | 3 months COBRA (grossed up) | **TOTAL** |
|---|---|---|---|---|---|---|
| $5,754.00 | $230.16 | $186.43 | $460.32 | $10,357.20 | $11,156.76 | **$28,144.87** |

### C) Mileah Williams

Ms. Williams was a full-time employee working 40 hours/week at an hourly rate of $19.02. Ms. Williams had been employed with Defendant for seven years.[8]

Had Ms. Williams been employed through September 30, 2021, and received a severance package of one week per year of service and three months of COBRA, she would be entitled to:

| Salary Pay 8/27 – 9/30 | Safe Harbor (8/27 – 9/30) | 401K Employer Match (8/27 – 9/30) | Vacation Accrued (8/27 – 9/30) | Severance (40 hours x $19.02 x 7 years) | 3 months COBRA (grossed up) | TOTAL |
|---|---|---|---|---|---|---|
| $3,804.00 | $152.16 | $123.24 | $304.32 | $5,325.60 | $11,156.76 | **$20,866.08** |

### D) Lisa Flautt

Ms. Flautt was a full-time employee working 40 hours/week at an hourly rate of $46.08. Ms. Flautt had been employed with Defendant for ten years.

Had Ms. Flautt been employed through September 30, 2021, and received a severance package of one week per year of service and three months of COBRA, she would be entitled to:

---

[8] While Plaintiff Mileah Williams testified that she had been employed for eight years, Defendant's calculations were based on company records as to completed years of service.

| Salary Pay 8/27 – 9/30 | Safe Harbor (8/27 – 9/30) | 401K Employer Match (8/27 – 9/30) | Vacation Accrued (8/27 – 9/30) | Severance (40 hours x $46.08 x 10 years) | 3 months COBRA (grossed up) | **TOTAL** |
|---|---|---|---|---|---|---|
| $9,216.00 | $368.64 | $298.59 | $737.28 | $18,432.00 | $11,156.76 | **$40,209.27** |

### E)  Kate Dunn

Ms. Dunn was a part-time employee working 30 hours/week at an hourly rate of $31.51. Ms. Dunn had been employed with Defendant for ten years.

Had Ms. Dunn been employed through September 30, 2021, and received a severance package of one week per year of service and three months of COBRA, she would be entitled to:

| Salary Pay 8/27 – 9/30 | Safe Harbor (8/27 – 9/30) | 401K Employer Match (8/27 – 9/30) | Vacation Accrued (8/27 – 9/30) | Severance (30 hours x $31.51 x 10 years)[9] | 3 months COBRA (grossed up) | **TOTAL** |
|---|---|---|---|---|---|---|
| $4,726.50 | $189.06 | $153.61 | $393.88 | $10,083.20 | $17,154.29 | **$32,700.54** |

---

[9] The Court notes that there appears to be an excess of $630.20 due to Plaintiff Kate Dunn in Defendants' calculations. However, because Ms. Zulauf and AgriSompo's payroll employee are in the best position to determine the amount due to Plaintiff Kate Dunn as her severance amount, the Court adopts the same here.

I further do not find that Plaintiffs have sufficiently proven entitlement to the somewhat nebulous "additional 40 hours of pay" allegedly promised by their prior employer Diversified in either 2019 or 2020 on account of some computer-related circumstance. There was simply no evidence offered that Defendant promised to pay that sum in exchange for the agreement of their continued employment. Nor do I find that punitive damages or attorneys' fees are awardable for this breach of contract claim. It is well established that in the context of contract cases, punitive damages are only recoverable "where the breach results from an intentional wrong or when there has been a showing of malice and gross/reckless disregard for the rights of other." *Paracelsus Health Care Corp. v. Willard*, 754 So. 2d 437, 442 (Miss. 1999); *Am. Funeral Assurance Co. v. Hubbs*, 700 So. 2d 283, 285 (Miss. 1997). The required showing of malice or reckless disregard required for punitive damages must be established by "clear and convincing" evidence. MISS. CODE. ANN. § 11-1-65(1)(a) (Supp. 2013); *Bar-Til, Inc. v. Superior Asphalt, Inc.*, 164 So. 3d 1028, 1031 (Miss. Ct. App. 2014).

While I find Defendant's conduct in terminating the processors for attendance at the training on August 24, 2021, to have been unjustified, given the testimony of witnesses for both the Plaintiffs and the Defendant, I simply do not find the claim at issue to amount to clear and convincing evidence of malicious or reckless disregard for the Plaintiffs' rights. Accordingly, Plaintiffs are not entitled to punitive damages, and therefore, are not entitled to attorneys' fees.[10]

## CONCLUSION

For the reasons stated herein, I find in favor of Plaintiffs as to their respective breach of contract claims and a judgment for awardable damages to each based thereon together with

---

[10] Under Mississippi law, in the absence of a contractual or statutory provision, attorneys' fees may not be awarded unless punitive damages are also proper. *American Rule*, 1 ENCYCLOPEDIA MISS. LAW § 8:2 (2d ed.) (West). If no punitive damages are awarded, then "attorneys' fees are clearly not to be awarded by the trial judge." *Mississippi Power Light Co. v. Cook*, 832 So. 2d 474, 488 (Miss. 2002).

interest at 8% per annum from September 30, 2021, to date of payment. Plaintiff Meredith Favi is awarded $43,968.60, Plaintiff Beverly Short is awarded $28,144.87, Plaintiff Mileah Williams is awarded $20,866.08, Plaintiff Lisa Flautt is awarded $40,209.27, and Plaintiff Kate Dunn is awarded $32,700.54. The Court does not find that attorneys' fees or punitive damages are awardable.

**SO ORDERED AND ADJUDGED** on this the 26th day of January, 2024.

*/s/ Jane M. Virden*
**UNITED STATES MAGISTRATE JUDGE**